## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### PARKERSBURG DIVISION

WILLIAM G. BUNNER, et al.,

                Plaintiffs,

v.                              CIVIL ACTION NO.   6:13-cv-20655

UNITED STATES OF AMERICA,

                Defendant.

### MEMORANDUM OPINION AND
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs William G. and Charlotte Bunner bring this medical malpractice action and accompanying loss of consortium claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80.   Plaintiffs allege that the United States, acting through its employee Ronald C. Michels, M.D., was negligent in its failure to promptly diagnose and treat a non-healing ulcer in Mr. Bunner's mouth.   Over time, they allege, this ulcer developed into aggressive squamous cell carcinoma.   At all relevant times, Dr. Michels was employed by the Veterans Affairs Medical Center ("VAMC") in Clarksburg, West Virginia.

Mr. Bunner exhausted his remedies as required by 28 U.S.C. § 2401(b) and filed the Complaint on July 18, 2013.   This Court is vested with subject matter jurisdiction over his malpractice claims inasmuch as he seeks to recover damages for an alleged tort of an employee of a federal agency.[1]   *See* 28 U.S.C. § 1346(b)(1).   The matter was tried to the Court without a jury

---

[1] As explained *infra*, the Court lacks subject matter jurisdiction over Plaintiff Charlotte Bunner's companion loss of consortium claim and it will be dismissed.

on May 12, 2015.   On the morning of trial, the United States moved to dismiss Mrs. Bunner's loss of consortium claim for failure to separately file an administrative claim as a prerequisite to litigation.   The Court took the motion under advisement.   Trial proceeded with Mr. Bunner testifying on his own behalf and calling as witnesses Mrs. Bunner, Dr. Michels, and medical expert Ernest Frierson, M.D.   The United States called Larry Russell, M.D. and Kris Sperry, M.D. as expert witnesses.   Following trial, the parties submitted written closing arguments for the Court's consideration.   In accordance with Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court now makes its findings of fact and conclusions of law.   Each finding is made by a preponderance of the evidence.

## I.   PRELIMINARY FINDINGS OF FACT AS TO MEDICAL HISTORY

Mr. Bunner was born on August 12, 1938.   He and his wife are residents of Wirt County, West Virginia.   On March 7, 2005, Mr. Bunner began receiving primary medical care from Dr. Michels at the Parkersburg, West Virginia Community Based Outpatient Clinic ("CBOC").[2]   His primary care appointments were generally scheduled every three to four months, with the last appointment, at least as can be identified from the available records, on September 8, 2011.[3] (Joint Trial Ex. 1, ECF No. 56–1 at 20, 27, 30–38, 44–48, 50–54, 59; ECF No. 56–2 at 1, 4.)   Mr.

---

[2] Though Dr. Michels was an employee of the Clarksburg VAMC, he was assigned to the Parkersburg CBOC in approximately 2003.   (Tr. at 8.)   The CBOC is located in Wood County and within the Southern District of West Virginia.   The FTCA permits an action to be brought either in the judicial district where the plaintiff resides or where the act or omission complained of occurred.   28 U.S.C. § 1402(b).   As Wirt County, the place of Mr. Bunner's residence, and Wood County, the place where Dr. Michels negligence allegedly occurred, are both located within the Southern District of West Virginia, venue in this district is proper.

[3] The parties jointly submitted Mr. Bunner's VAMC medical records as Joint Trial Exhibit 1.   It appears that they selected only relevant portions of the medical history to submit as evidence, as the pagination imprinted on the records by the VAMC is not continuous.   The records have also been submitted in reverse chronological order, with the most recent records appearing first.   For the sake of clarity, the Court will use the ECF pagination imprinted on the trial exhibit (ECF No. 56) when citing to Mr. Bunner's medical records.

Bunner had a number of chronic medical conditions monitored by Dr. Michels, including diabetes, atrial fibrillation, hypertension, and high cholesterol.

The first reference to Mr. Bunner's non-healing mouth sores in his VAMC medical records appears in an otolaryngology progress note dated February 22, 2006.   (ECF No. 56–1 at 58.)   Dr. Michels had initially referred Mr. Bunner to the otolaryngologist, Dr. Mark Armeni, for complaints of post-nasal drip.[4]   (Tr. 11.)   At the otolaryngology appointment, Mr. Bunner complained of mouth sores that had been present "for the last couple of weeks." (ECF No. 56–1 at 60.)    Upon examination, Dr. Armeni observed two ulcerative areas, one on either side of Mr. Bunner's mouth. Dr. Armeni scheduled a follow-up visit for April 5, 2006 for the purpose of reevaluating the ulcers. After noting the resolution of other unrelated medical concerns, Dr. Armeni wrote on that date: "He is mainly bothered by these tender nonhealing areas in his mouth.   He states he has an area on the left side that remains there constantly.   The area on the right side will intermittently heal and then flare up again."   (ECF No. 56–1 at 58.)   Each ulcer measured approximately 2.3 centimeters in diameter.   Dr. Armeni identified the ulcers as leukoplakia, a term used to describe white patches on the mucus membranes of the mouth.   He ordered a biopsy of the left lesion and prescribed an oral rinse of lidocaine, Maalox, and Benadryl to provide temporary pain relief while the lesions healed.   (*Id.*)   The right lesion was not biopsied.[5]

---

[4] An otolaryngologist is a physician specializing in disorders of the ear, nose, and throat.

[5] The portions of Dr. Armeni's notes that were submitted as evidence do not indicate whether the biopsy was taken of the right or left lesion.   In fact, in the progress note of June 7, 2006, Dr. Armeni notes that the VAMC had biopsied "these" lesions, giving rise to the inference that a biopsy of both lesions had been taken.   (ECF No. 56-1 at 56.)   The testimony presented at trial, however, indicated that a biopsy of only the left lesion was performed.   The United States' expert Kris Sperry, M.D., for example, testified that the 2006 pathology slides he reviewed were created from tissue removed from the left buccal mucosa.   (Tr. at 135.)   The parties seem to be in agreement on this point.   The Court therefore finds as a matter of fact that the VAMC performed a biopsy of the left lesion, but not the right, in April 2006.

Mr. Bunner's mouth sores still had not healed by the time of a second follow-up visit with Dr. Armeni on June 7, 2006.   Dr. Armeni noted the continued presence of "lacy leukoplakia or whitish patchy lesions on the buccal mucosa."   (*Id.* at 56.)   According to the results of the biopsy, however, the left lesion was benign: the pathology report showed "chronic inflammation with no evidence of cancer."   (*Id.*)   Mr. Bunner reported that the oral rinse was helping to lessen his pain, and Dr. Armeni renewed the prescription.   Following this appointment with Dr. Armeni, Mr. Bunner continued to attend his regularly scheduled primary care appointments with Dr. Michels. Dr. Michels testified that he was aware of Dr. Armeni's findings, though he never observed Mr. Bunner's mouth ulcers personally. (Tr. 12.) His primary care notes over subsequent years do not document any complaint of mouth pain, yet Dr. Michels renewed the prescription for the oral rinse on November 13, 2008, February 17, 2010, and at least one other occasion, with no explanation as to its need.[6]   (ECF No. 56-1 at 14, 40.)   Dr. Michels testified that a bottle of the oral rinse contained a supply sufficient for approximately fourteen days of repeated use.   (Tr. 21.)

Mr. Bunner's primary care records do not reveal when, if ever, the right mouth sore healed. Dr. Michels' progress notes are conspicuously brief, and their general format does not vary.   They typically begin by documenting Mr. Bunner's vital signs on the day of the appointment and include a list of allergies, recent immunizations, chronic medical conditions, and prescribed medications

---

[6] Unfortunately, the parties' decision to submit only portions of the VAMC medical records has made the Court's review of the evidence more difficult.   For example, the medication lists that would normally follow the progress notes from Mr. Bunner's primary care appointments have not, in several instances, been included in the parties' submission.   The trial testimony provided uncontroverted evidence, however, that Dr. Michels reordered the oral rinse prescription on three separate occasions between 2006 and 2010.   (Tr. 15, 106.)   Dr. Michels himself so testified.   (Tr. at 15.)   From the VAMC records that are available, however, one can only ascertain that the prescription was ordered by Dr. Michels on November 13, 2008, and February 17, 2010.   Based on testimony of witnesses who, unlike the Court, had presumably been provided with the full medical record, the Court will find by a preponderance of the evidence that Dr. Michels ordered the oral rinse prescription three times.

with accompanying dosage.   These progress notes correspond to twenty-four primary care appointments held over the span of six years.   Despite the frequency of the visits, the progress notes do not provide much insight into Mr. Bunner's medical history.   They rarely reveal the various subjects discussed between doctor and patient during a given appointment.   When medications are prescribed, the notes do not contain an accompanying explanation.   Dr. Michels does not record a single medical-related complaint raised by Mr. Bunner between 2005 and April 2011, whether related to mouth pain or otherwise.

Portions of Mr. Bunner's dental records were also submitted as evidence at trial.   Douglas J. Mills, D.D.S. was Mr. Bunner's dental care provider between the years of 2007 and 2011.   It appears that Mr. Bunner lacked dental insurance and rarely received prophylactic dental care. Rather, Mr. Bunner typically sought dental treatment as necessary to address acute concerns.   Mr. Bunner had dental appointments with Dr. Mills on May 16, 2007 (to replace a filling), April 22, 2009 (for general cleaning), and December 1, 2010 (to repair a broken molar).[7]   (ECF No. 56-5 at 51–52; Mills Dep. at 10–12, ECF No. 56-5 at 35–37.)   The records memorializing these appointments are also brief, containing a numerical identifier for the particular tooth treated and a short description of the dental care provided.   There are no documented complaints of mouth pain or non-healing ulcers in Mr. Bunner's dental records, nor are there any recorded findings by his dentist that such ulcers were observed.   Dr. Mills testified by deposition that if a dental patient reports to him with an acute dental problem, as Mr. Bunner did in 2007 and 2010, he would likely

---

[7] The Court cannot ascertain the dates of the dental appointments from the dental records because the parties have submitted a copy with the left margin cut off.   Only the day and year are legible.   (*See* ECF No. 56-5 at 51–52.)   The Court has verified the dates of these dental appointments through reference to Dr. Mills' deposition, which was submitted as a joint exhibit at trial.

resolve the problem without conducting a comprehensive examination.   (ECF No. 56-5 at 9.)   He

agreed, however, that he would have noted the presence of any oral lesions had he observed them.

On April 21, 2011, Mr. Bunner called the VAMC to report a sore in his mouth that refused

to heal.   He reported that he had suffered with the sore for over a year, but that in the last three

months the pain had become unbearable.   The nurse who received the call noted:

> [P]atietn [sic, patient] called and states he has a sore in his mouth for over one year,
> has been worse over the past 3 months.   [C]an only chew from one side of his
> mouth due [to] pain in that area.   [H]as shown his pcp (but states it is worse)[,] has
> shown a dentist and they do not know what to tell him according to patient. . . .
> states has been using a saline rinse and campho-phenique on the area.   [L]ast year,
> was ordered a mixture of lidocaine/Maalox/Benadryl 1:1:1 which numbed the area.
> [S]tates it even hurts to shave on that side of his face due to the soreness.   Patient
> states this seemed to get worse after he started on insulin.   Has a pcp appt[.] in May
> but does not want [to] wait to start some type treatment [sic] for his mouth.

(ECF No. 56-1 at 29.)   Dr. Michels acknowledged receipt of this message later that day.   (*Id.*)

Dr. Michels brought Mr. Bunner in for an examination of this chronic ulceration of the right lower

buccal mucosa on May 11, 2011.   (*Id.* at 27.)   Though the progress note does not contain

documentation of an oral examination or action proposed as a result, the Court can deduce from

the subsequent records that Dr. Michels made the decision to refer Mr. Bunner to an

otolaryngologist for consultation.   Mr. Bunner's appointment with the otolaryngology consultant,

Dr. Charles Haislip, was held on June 8, 2011.   (*Id.* at 24–25.)   Dr. Haislip's progress note

records the following: "This patient is a 72-year-old gentleman who was seen in consultation from

Dr. Michels.   He has a history of an intermittent lesion of the right lower lip that is very painful.

This seems to fluctuate in size and intensity, again, over the past year or so." (*Id.*)   Dr. Haislip

described the ulcer as "pearly red," "exquisitely tender," and "about 2 cm in diameter." (*Id.*)   He

also noted the presence of a large amount of "feathery leukoplakia."   He recommended treatment

with Kenalog ointment and a Mycostatin rinse, with follow-up in two weeks' time.   Mr. Bunner

returned to Dr. Haislip on June 22, 2011 and reported no improvement in his symptoms.   (*Id.* at 23.)   A biopsy of the lesion was taken, and on June 29, 2011, Mr. Bunner reported for the results. A pathology report from the biopsy confirmed that Mr. Bunner had mouth cancer, specifically, squamous cell carcinoma involving the right buccal mucosa, and recommended wide local excision of the tumor.   (*Id.* at 22.)

On July 8, 2011, Mr. Bunner notified the VAMC of his intent to have the tumor excision performed by a private physician.   (ECF No. 56-1 at 21.)   He transferred to Dean Bobbitt, D.D.S., for a second opinion and surgery.   Dr. Bobbitt made an attempt to surgically remove the cancer on July 13, 2011, but was not entirely successful.   He removed a piece of tissue that measured 2.1 centimeters in length, 1 centimeter in width, and 4 millimeters in depth.   (ECF No. 56-5 at 2.) The resulting pathology report confirmed the tissue's malignancy, but stated that the surgical margins of the tissue sample were positive for cancer and hence the tumor "need[ed] to be treated more aggressively."   (*Id.* at 3.)   Dr. Bobbitt offered insight into this pathologist report at his deposition, which was submitted as a joint exhibit at trial.   Dr. Bobbitt testified that upon his initial examination of Mr. Bunner's mouth, he was surprised to find that "things looked kind of normal."   (Bobbitt Dep. at 7, ECF No. 56-4.)   Mr. Bunner had no open sore in his mouth, no ulcer that appeared cancerous upon visual inspection.   (*Id.* at 31 ("My exam showed a slightly raised and painful area to the right buccal mucosa with no ulcerations and the borders very irregular").)   The cancer was "moving fast and growing deep."   (*Id.* at 24.)   Dr. Bobbitt explained that the cancer "extended deeper than what [he] removed" and that tissue replacement would be necessary because "[i]t was big enough that . . . you couldn't just sew it back together." (*Id.* at 20.)

Dr. Bobbitt referred Mr. Bunner to the Charleston Area Medical Center ("CAMC") for further surgery and reconstruction as needed.   (*Id.* at 6.)   Mr. Bunner was admitted to the CAMC hospital on September 20, 2011.   He again underwent surgery to remove the squamous cell carcinoma in his right cheek.   The necessary reconstruction surgery included right neck dissection at levels 1, 2, and 3, a "radial forearm free flap from the left arm to the right side intraoral defect," and a split-thickness skin graft from the left lateral thigh to the left radial forearm.   (ECF No. 56-3 at 1–2.)   In other words, tissue from Mr. Bunner's wrist was grafted on to the wound in his mouth, and tissue from his thigh was then used to replace the skin of his wrist.   The CAMC pathologist staged Mr. Bunner's cancer as stage I.   (*Id.* at 4.)   Mr. Bunner was intubated and sedated in the Intensive Care Unit following surgery.   He was extubated on September 29, 2011, and discharged on October 7, 2011.   He received home nursing care between October 8, 2011 and December 28, 2011.   (*Id.* at 6–8.)

At the time of trial, Mr. Bunner's oral cancer had not returned.   Mr. Bunner continues to suffer nerve damage, decreased sensation, and poor mobility in his left arm, wrist, and fingers due to the skin graft.   (ECF No. 56-3 at 12; Tr. 39–43.)

## II.   *PRELIMINARY CONCLUSIONS OF LAW*

The FTCA renders the United States liable for the negligent acts of its employees committed "while acting within the scope of [their] employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).   The VAMC is a federal entity operated by the United States Department of Veteran Affairs.   At all times relevant to this action, Dr. Michels was an agent of and was acting within the scope of his employment to further the business of the United States.

8

Under the FTCA, the law of the state where the alleged negligence occurred provides the substantive law of the case.   28 U.S.C. § 1346(b).   In this case, West Virginia medical malpractice law (the Medical Professional Liability Act, or "MPLA") applies.   *See, e.g.*, *Osborne v. United States*, 166 F. Supp. 2d 479 (S.D. W. Va. 2001) (applying the MPLA); *Bellomy v. United States*, 888 F. Supp. 760 (S.D. W. Va. 1995) (same).   The MPLA sets forth the elements of a medical negligence claim as follows:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

> (2) Such failure was a proximate cause of the injury or death.

W. Va. Code § 55-7B-3(a)(1)–(2).   Thus, to prevail on a claim under the MPLA, the burden is on the plaintiff to prove, by a preponderance of the evidence, that the defendant was negligent and that the negligence was a proximate cause of the plaintiff's injury.   *Sexton v. Greico*, 613 S.E.2d 81, 83 (W. Va. 2005) (per curiam) (quoting Syl. Pt. 2, *Walton v. Given*, 215 S.E.2d 647 (W. Va. 1975)).   The West Virginia Supreme Court of Appeals has defined "proximate cause" as "'that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred.'" *Mays v. Chang*, 579 S.E.2d 561, 565 (W. Va. 2003) (quoting Syl. Pt. 3, *Webb v. Sessler*, 63 S.E.2d 65 (W. Va. 1950)).   If the plaintiff proceeds on a "loss of chance" theory, as Mr. Bunner does here, he "must also prove, to a reasonable degree of medical probability, that following the accepted standard of care would have resulted in a greater than twenty-five percent chance that the patient would have had an improved recovery or would have survived."   W. Va. Code § 55-7B-3(b).

9

In West Virginia, the standard of medical care is a national one.   Syl. Pt. 1, *Paintiff v. City of Parkersburg*, 345 S.E.2d 564 (W. Va. 1986).   That standard imposes a duty on a physician to render reasonable and ordinary care in the diagnosis and treatment of a patient.   Syl. Pt. 3, *Utter v. United Hosp. Ctr., Inc.*, 236 S.E.2d 213 (W. Va. 1977).   A deviation from this duty is malpractice.   *See Mays*, 579 S.E.2d at 565.   A plaintiff is generally required to establish the applicable standard of care and breach thereof by use of expert testimony.   W. Va. Code § 55-7B-7; *Bellomy*, 888 F. Supp. at 764.   "Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine."   *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997).

## III.   FINDINGS OF FACT AS TO EXPERT TESTIMONY

Ernest L. Frierson, M.D., testified for Mr. Bunner as an expert in the field of family practice primary care.   (Tr. 56.)   Starting from the premise that Mr. Bunner did, in fact, complain of non-healing mouth sores during his primary care appointments, Dr. Frierson identified several acts and omissions on the part of Dr. Michels that fell below the accepted standard of care.   First, Dr. Frierson testified that Dr. Michels' recordkeeping was inadequate because he failed to properly and completely document Mr. Bunner's complaints of mouth sores.   (Tr. 63.)   With regard to recordkeeping, he testified: "Reviewing the records, it's very problematic because there's very poor documentation.   There's very poor documentation of complaints.   There's very poor documentation of findings and there's poor documentation of exams relating to findings."   (*Id.*) As evidence of this poor documentation, Dr. Frierson noted that Dr. Michels' progress note of May 11, 2011 contained no documentation of an oral exam.   (Tr. 64.)   As Mr. Bunner had called in his complaint of an extremely painful, persistent mouth sore just three weeks earlier, evaluation of

the sore would have been a primary focus of the appointment.   Indeed, Dr. Michels testified that

he had, in fact, inspected Mr. Bunner's mouth on that day and observed the lesion.   (Tr. 18.)

Dr. Frierson opined that Dr. Michels failed to appreciate the clinical significance of his

patient's history of mouth sores.   Dr. Frierson described leukopakia as a "pre-cancerous lesion,"[8]

(Tr. 66), and testified that although addressing a sore with a prescription for "magic mouthwash,"

his term for the medicated oral rinse, may have been initially appropriate for a matter of weeks, it

was incumbent upon Dr. Michels to monitor the sore and refer Mr. Bunner to the appropriate

specialist when it failed to heal.   Had he done so, Dr. Michels could have ruled out or confirmed

a cancerous process as the cause of Mr. Bunner's persistent lesions.   In Dr. Frierson's opinion,

the failure to recognize the clinical significance of the sore prevented Mr. Bunner from receiving

a timely referral.   Dr. Frierson also testified that the oral rinse prescribed to Mr. Bunner is

typically used for the purpose of temporarily reducing soreness in the mouth.    He testified that

prescribing the oral rinse on multiple occasions without a documented reason was also a departure

from the standard of care.

Dr. Frierson testified that as a result of Dr. Michels' deviations from the standard of care,

Mr. Bunner suffered exacerbation of his cancer and was forced to undergo more extensive surgery

than would have been required if the cancer had been timely diagnosed and treated.   (Tr. 71.)   In

his opinion, the "best data" regarding the development of the cancer was the description provided

by Mr. Bunner during his April 21, 2011 phone call to the VAMC.   (Tr. 69.)   If Mr. Bunner had

truly been complaining of an ulcerative lesion that had been present for months, he testified that

---

[8] Drs. Russell and Sperry agreed that leukoplakia can be a precursor to cancer. (Tr. 115, 162.)   Dr. Sperry testified with regard to leukoplakia: "Over an individual's lifetime who has leukoplakia, there's a totality of a little less than a 5% risk that it may become or evolve into cancer, it's small, but the probability certainly is there."   (Tr. 162.)

an automatic referral to a specialist for biopsy would have been warranted because "there aren't many inflammatory lesions that will last for months."  (Tr. at 69.)  Given Mr. Bunner's self-described history of complaints, Dr. Frierson believed that he "should have been referred much, much earlier."  (Tr. 64.)  Dr. Frierson testified that following the accepted standard of care would have resulted in a greater than twenty-five percent chance of an improved recovery.  (Tr. 71.)  He reasoned:

> If Mr. Bunner had been promptly referred, the treatment by the consultant would have been definitive, which is the biopsy. . . . even if Dr. Michels didn't see anything in the mouth, but persistent pain, history of leukoplakia, just refer and be done with it.  You know what you're dealing with.  Catch it early.  Early catch, better result.

(Tr. 71.)  He added that he held his opinions to a reasonable degree of medical probability. (Tr. 71.)

Larry Russell, M.D., testified for the United States as an expert in the field of family practice medicine.  (Tr. 94.)  He limited his opinions to the standard of care and did not render an opinion on causation.   He was in complete agreement with Dr. Frierson as to what the pertinent standard of care required in regard to a physician's documentation of and response to patient complaints.   He explained: "[Y]ou basically document the complaint as to what you were told, the information that you elicit and . . . the pertinent positives and negatives that surround that, and the exam that goes with it."  (Tr. 101.)   On cross-examination, he agreed that a reasonable physician must document a patient's complaints in the medical records, make referrals based upon his assessment of the patient's presentation, and note pertinent positives and negatives in the patient's chart.  (Tr. 112.)

Despite the unanimity on the applicable standard, Dr. Russell nonetheless opined that Dr. Michels complied with the standard of care because, following the April 5, 2006 biopsy and prior

12

to April 21, 2011, Mr. Bunner's medical records lack any objective evidence of complaints of

mouth pain.   He admitted that his opinion would change if Mr. Bunner's testimony was accepted

as true:

> Q:     [Y]ou read Mr. Bunner's deposition?
>
> A:     Yes, sir.
>
> Q:     And you know that . . .   he stated in his deposition that he complained repeatedly to Dr. Michels about sores in his mouth and couldn't get Dr. Michels to do anything.   Is that a fair characterization of his complaints based on your recollection?
>
> A:     Yes, sir.
>
> Q:     In fact, if that's true, did Dr. Michels meet the standard of care based on your review of the records?
>
> A:     If what Mr. Bunner stated is true then, no, Dr. Michels would not have met the standard of care.

(Tr. 106–07.)

With Dr. Russell's testimony, the United States cemented its theory that the "aphthous

ulcers" in Mr. Bunner's mouth waxed and waned over the years of his treatment with the VAMC.

Dr. Russell testified that an "aphthous ulcer" is "an area of erosion or a sort of a hole within the

tissue . . . usually within what we call the 'buccal mucosa' inside the mouth," and that such ulcers

are "tender" and "fairly common" among some people.[9]   (Tr. 101.)   He added that the ulcers often

present as a "recurrent problem," and may heal on their own if left alone.   (Tr. 101.)   He pointed

out that the pattern of Mr. Bunner's prescriptions for "magic mouthwash" suggests that Mr.

Bunner's mouth sores came and went, and were not present continuously from the time of his April

---

[9]  Dr. Russell defined "buccal mucosa" as the lining of the cheek where "[t]he cheek meets the gum."   (Tr. 103.)

2006 biopsy when they were first observed by Dr. Armeni.   Because the refills were ordered so infrequently (three times by Dr. Michels in approximately four years), and given the small dosage contained in a prescription, Dr. Russell's testimony suggested that Mr. Bunner was not experiencing mouth pain regularly.   (Tr. 105–06.) He opined, to a reasonable degree of medical probability, that sporadic prescription of the oral rinse was an appropriate treatment of aphthous ulcers in light of evidence that they intermittently healed and later reoccurred.   (Tr. 106.)

Kris L. Sperry, M.D., testified as an expert for the United States in the field of forensic pathology.   (Tr. 119.)   At the time, Dr. Sperry was employed as the chief medical examiner for the State of Georgia.   He did not render any standard of care opinions; rather, his proffered opinions were limited to the realm of causation.   (Tr. 162.)   Dr. Sperry began by explaining that pathologists estimate the age of a cancerous tumor based on its "doubling time," or the amount of time it takes for a group of cells to double in size.   (Tr. 128.)   He noted that squamous cell cancer of the mouth "is one of the faster growing cancers that is known in all of cancer study," with an average doubling time of six to seven days.   (Tr. 130.)

Before rendering his opinion on causation, Dr. Sperry discussed at length four separate sets of pathology slides representing tissue taken from Mr. Bunner during the following medical procedures: the April 5, 2006 biopsy of the left buccal mucosa lesion performed at the VAMC; the June 22, 2011 biopsy of the right buccal mucosa lesion, also taken at the VAMC; Dr. Bobbitt's excision of cancerous tissue of the right buccal mucosa on July 13, 2011; and Mr. Bunner's surgery at CAMC on September 20, 2011.   When questioned about his review of the 2006 pathology slide, Dr. Sperry indicated that the slide showed some inflammation, but otherwise normal tissue.   Mr. Bunner's left lesion was neither cancerous nor pre-cancerous at that time.   The 2011 slide of tissue biopsied by Dr. Haislip provided a microscopic view of tiny "nips" of tissue extracted for the

14

purpose of diagnosis.   (Tr. 170.) Dr. Sperry confirmed that these tissue specimens revealed "well-differentiated," or relatively mature, cancer cells.   (Tr. 144.)   By comparison, the tissue excised by Dr. Bobbitt showed "dedifferentiation" of the cancer cells.   (Tr. 145.) Dr. Sperry described the cells at this point as "moderately even to poorly developed squamous cell cancer" and noted they were becoming "very aggressive."   (Tr. 145.) The slides from Dr. Bobbitt's excisional biopsy also revealed the presence of "inflammatory cells," which proved that "Mr. Bunner's immune system [was] very active and . . . trying to fight the cancer."   (Tr. 143.)

Based on the tumor's size, Dr. Sperry opined that Mr. Bunner's oral cancer had been present for between six to eight months by the time it was excised, at least in part, by Dr. Bobbitt.[10] (Tr. 153.)    He admitted on cross-examination that Mr. Bunner's "robust" immune response could have slowed the cancer's growth.   (Tr. 167–8.)   He reasoned that "the more active a person's immune system is, then the greater the inhibition of cancerous cells progressing into invasive cancer becomes."   (Tr. 167.)   He also admitted that he did not take into account the size of the tissue samples removed by the VAMC in determining the tumor's size.[11]

---

[10] Dr. Sperry noted that the tumor removed by Dr. Bobbitt measured 2.1 centimeters in length, one centimeter in width, and four millimeters in depth, for a total volume of approximately one cubic centimeter. (Tr. at 153.)   A tumor of this size would be comprised, on average, of one billion cells.   Given the average doubling time of six to seven days for oral squamous cell carcinoma, (Tr. at 130), Dr. Sperry concluded that six to eight months was a reasonable estimate of the time it would take for Mr. Bunner's tumor to reach that size.   (Tr. at 153—54.)

[11]    Because a tumor's proportions partly determine its staging, Dr. Sperry was questioned extensively about the size of Mr. Bunner's tumor.   He testified that stage T1 means "that a tumor is no greater than 2 centimeters" in dimension.   (Tr. 131, 168.)   The tissue removed by Dr. Bobbitt measured 2.1 centimeters in length, one centimeter in width, and four millimeters in depth.   However, two of the three tissue samples extracted for biopsy by the VAMC in June 2011 reportedly also measured 2.1 centimeters in greatest dimension.   (*See* Tr. 172.)   If the VAMC's measurements are correct, Mr. Bunner's tumor would have been approximately six centimeters in diameter by the time of diagnosis (adding four centimeters measured by the VAMC to the two centimeters measured by Dr. Bobbitt), and, based on its size, may have been staged at stage T2 or even T3.   Dr. Sperry opined that the VAMC's measurements were likely the result of typographical error because it was unlikely that four centimeters of tissue would have been extracted for purpose of biopsy.   In fact, he reasoned that it was "impossible" for the biopsied tissue to be that size

Dr. Sperry further testified that although in his opinion the cancer had been present for only six to eight months, pre-cancerous abnormal changes in the cells of the buccal mucosa would likely have taken place as a precursor to cancer:

> Q.    I believe you testified in your deposition that the vast majority of cancers were preceded by a pre-malignant change or a carcinoma in situ, correct?
>
> A.    Of squamous cell cancers, again, of the type that Mr. Bunner has, yes, because they arise from the epithelium, or the lining of the sides of our cheeks.   That's – those cells begin to undergo changes first.   That's generally understood and accepted before they turn into cancer and then begin invading underneath the epithelial layer.
>
> Q.    And do you believe, more likely than not, that that's what happened here with Mr. Bunner?
>
> A.    Yes. . . . I think, more probably than not that, at some point, there was dysplasia, or there was change of the epithelium, you know, at or around the site where the cancer began to develop and invade.   So, there would have been some kind of epithelial change.

(Tr. 163–64.)   As to whether those early epithelial changes would have been susceptible to detection by a pathologist, Dr. Sperry testified: "Yes.   If there is a biopsy taken then, oh, yes, they can be identified."   (Tr. 164.)   He added that carcinoma in situ can be present "months before" the cells become malignant.   (Tr. 166.)   Dr. Sperry was asked to opine on cross-examination about whether an ulcer in Mr. Bunner's mouth developed in this way:

---

"based upon . . . how the biopsy was taken and the size of the tissue on the slides."   (Tr. 172.)   Dr. Bobbitt also hypothesized that the VAMC measurements were wrong, indicating that the question could be resolved by "looking at the slides."   (Bobbitt Dep. 32.)   He added that when Mr. Bunner reported to him for surgery following the VAMC biopsy, Mr. Bunner had no scar in his mouth as Dr. Bobbitt would expect to observe if an inch of tissue had already been removed.    (*Id.*)   Dr. Haislip's description of the mouth sore in June 2011 provides further evidence that the VAMC's report is incorrect. He described the sore as measuring "approximately 2 cm. in diameter."   (ECF No. 56-1 at 22.)   His observations are not consistent with a pathology report indicating that more than four centimeters of tissue was extracted.   The Court finds that the VAMC measurements of the biopsied tissue were, more probably than not, incorrect, and that Mr. Bunner's cancerous sore at most measured just over two centimeters in greatest dimension.

16

Q.     So, is it fair to say that sometime between 2006 and 2011, the lesion – a lesion that developed in his mouth on the right side would have become precancerous?

A.     Most probably.   You know, that's reasonable.   It's not certain because they don't always act this way, but that possibility certainly exists.

Q.     Is it more likely than not?

A.     As it's understood, it probably is more likely than not.

(Tr. 166—67.)   He added that once carcinoma in situ is present it can theoretically resolve on its own without intervention, and does not "inevitably" become cancerous.   (Tr. 167.)

### IV.     FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO LIABILITY

#### A.     Breach of the Standard of Care

The applicable standard of care is not in dispute.   The Court finds that a reasonable physician must document his patient's complaints and respond to those complaints as necessary to provide treatment.   In response to a patient's complaints of painful, non-healing oral lesions, a reasonable physician could have comported with the standard of care either by conducting an examination of the patient's mouth, followed by a referral to the proper specialist depending on the results of the examination; or by automatically referring the patient without the necessity of an oral examination, depending on the nature and severity of the complaints.   Furthermore, a reasonable physician in Mr. Bunner's case would have recognized the heightened risk presented by Mr. Bunner's persistent mouth ulcers given his documented history of leukoplakia, a condition which can become pre-cancerous.

This pivotal question remains: whether Mr. Bunner alerted Dr. Michels to the presence of a non-healing ulcer in his mouth prior to April 21, 2011.   If Mr. Bunner's ulcer was, for the most part, a lesion that intermittently healed and reappeared during the course of his treatment, Dr.

Michels did not act unreasonably by not doing more to diagnose and treat it. Certainly, since aphthous ulcers under normal circumstances heal in a matter of weeks, a referral to an otolaryngologist under this scenario would have been fruitless. The ulcers would likely have healed by the time of the referral appointment.

The objective medical evidence of Mr. Bunner's mouth ulcers contained in the VAMC records can be used to support either party's position. Dr. Armeni observed and documented two tender mouth sores that persisted between otolaryngology appointments of February 22, 2006 and June 7, 2006. From June 7, 2006 until April 21, 2011, however, the available VAMC records lack any reference to mouth sores. Still, Dr. Michels continued to prescribe—albeit infrequently—the oral rinse originally prescribed by Dr. Armeni to control Mr. Bunner's symptoms of mouth pain. Though Dr. Michels did not document the reason for the prescription, the inescapable conclusion is that the oral rinse was prescribed in response to mouth pain. The parties' experts agreed that this oral rinse has no other recognized use. (Tr. 68, 102.) The third piece of objective medical evidence is the description of Mr. Bunner's mouth ulcer by the VAMC otolaryngologist on June 9, 2011. (ECF No. 56-1 at 25.) While this otolaryngology note confirmed the presence of a "red ulcerative area on the lower buccal mucosa," (*id.*), that turned out to be malignant, the United States' takes the position that Dr. Michels took steps to treat this ulcer as soon as he became aware of it.[12]

---

[12] During its questioning at trial, the United States made much of the otolaryngologist's note on June 6, 2011 that Mr. Bunner's ulcer "fluctuate[d] in size and intensity, again, over the past year or so." (ECF No. 56-1 at 25.) The Court does not take this note to mean, as the United States suggests, that the ulcer sporadically healed and reappeared over the preceding year. The physician's notes merely suggest that at times the sore was less painful, less obvious than at others.

18

The Court finds that Dr. Michels prescribed the oral rinse in response to acute complaints of mouth pain.[13]   It also declines to accept the United States' conclusion that because the oral rinse contained only enough dosage for approximately two weeks, and Dr. Michels prescribed it on only three occasions between 2006 and 2010, that Mr. Bunner was not experiencing a lingering and persistent mouth sore.   Mr. Bunner testified that he used other medications ("Listerine, whatever I could get") to decrease the mouth pain he experienced, and added that he also obtained the "magic mouthwash" from CVS Pharmacy through a different prescription issued by, presumably, another medical provider.   (Tr. 54–55.)   The otolaryngologist note from June 9, 2011 confirms this testimony.   It indicates that Mr. Bunner reported using Orabase toothpaste and "hydrogen peroxide gargles" to treat his painful ulcer.   (ECF No. 56-1 at 25.)   Similarly, Mr. Bunner reported during the April 21, 2011 phone call to the VAMC that he had attempted to manage his pain with a saline rinse and campho-phenique.   (*Id.* at 29.)   Dr. Michels' infrequent prescription of the "magic mouthwash," therefore, does not necessarily mean that Mr. Bunner's ulcers healed during the time it was not prescribed.

Ultimately, the resolution of this factual question pivots on the issue of credibility.   The Court must determine whether Mr. Bunner or Dr. Michels is more believable.   Mr. Bunner was a highly credible witness.   He testified without equivocation that he brought his mouth ulcers to Dr. Michels' attention during almost every visit.   (Tr. 32–33.)   His testimony was corroborated not

---

[13] Dr. Michels speculated that there could be various reasons why he prescribed the oral rinse apart from an acute episode.   He explained that many of his patients suffer from chronic pain, and that during their visits he routinely orders refills of pain medication "if they would like to keep some around."   (Tr. 16.)   Still, he admitted that his progress notes contained no indication of whether Mr. Bunner was suffering from an "acute episode", and thus required the oral rinse prescription, or not.   In light of the competing evidence discussed in this section, the Court finds it unlikely that Dr. Michels refilled Mr. Bunner's "magic mouthwash" prescription as a matter of course rather than in response to complaints of pain.

only by the testimony of his wife, who was present at her husband's appointments and confirmed the frequency of his complaints, but also by the notes commemorating Mr. Bunner's April 21, 2011 phone call to the VA Clinic.   These notes, already four years old at the time of trial, are perhaps the best indication of the truth of Mr. Bunner's allegations.   Because they provide a contemporaneous account of Mr. Bunner's complaints, they are free from any suggestion of bias that could allegedly have arisen following his cancer diagnosis to taint Mr. Bunner's perception of Dr. Michels.

The above-referenced portion of Mrs. Bunner's testimony is worth detailed discussion. Mrs. Bunner testified after her husband but was present in the courtroom during his testimony. On direct examination, she was asked:

> Q.    Do you recall anytime between 2006 and 2011 when your husband complained to Dr. Michels in your presence regarding ulcerations in his mouth?
>
> A.    Yes, I do.
>
> Q.     Can you give us an idea as to how many times?
>
> A.    Not as many in the beginning. At the end, it was about every time, because he -- he couldn't stand the pain at the end.
>
> Q.    Were you present for Dr. Michels' examinations of Mr. Bunner when you were with him?
>
> A.    No. I didn't see any examinations and I went with him into the room always.
>
> Q.    But you did not see the examinations?
>
> A.    No.
>
> Q.    Okay. Was his testimony, to your recollection, accurate regarding the problems he was having with his mouth in the months before he was diagnosed with cancer?

> A.    Yes, he was right. I will say he – he's a tough man. He toughed it out as long as he could until the pain got so bad he couldn't lay on that side.

(Tr. 85–86.)   Citing this testimony, the United States suggests that Mr. Bunner did not complain of mouth ulceration to Dr. Michels until just before his cancer diagnosis.   Her testimony raises the question of when Mr. Bunner had most recently seen Dr. Michels prior to his telephone call to the VAMC on April 21, 2011.   Dr. Michels testified that Mr. Bunner did not attend a primary care appointment in 2011 until May 11, when he reported to Dr. Michels for an evaluation of his mouth ulcers:

> Q.    And I believe, in 2011, he had stopped coming to your clinic, correct?

> A.    Yes. In December of 2010, he had a scheduled appointment with me and did not show up for that appointment and I didn't see him again until we saw him for the ulcer and made the referral in the spring.

(Tr. 19.)

Mr. Bunner's primary care records contradict this testimony.   They show that Mr. Bunner had a primary care appointment on February 8, 2011[14] and attended previous appointments on November 15, 2010 and September 2, 2010.   (ECF No. 56-1 at 30–32.)   The schedule of these appointments was typical of Mr. Bunner's primary care routine.   There is no indication that Mr. Bunner missed an appointment in December 2010, furthermore, since he attended an appointment in November, a subsequent visit typically would not have been scheduled until approximately February or March.   Dr. Michels' testimony, on the other hand, is not only inconsistent with the records, but with the general pattern of Mr. Bunner's appointments.   Never in Mr. Bunner's seven

---

[14] While the progress note from this appointment, like the others, does not include any notations of the subjects discussed between Mr. Bunner and Dr. Michels, the February progress note records Mr. Bunner's blood pressure reading on that date.   If his blood pressure was tested, the Court can only conclude that despite Dr. Michels testimony, Mr. Bunner was present for this appointment.

21

year history of primary care at the COBC did Mr. Bunner have a six month lapse between appointments as Dr. Michels testified he did between December 2010 and May 2011.

There is no telling whether this testimony manifests an intent to mislead or simply Dr. Michels' unfamiliarity with the medical records. Either way, this inconsistency is just one example of why the Court finds it difficult to accept Dr. Michels' testimony wholesale. Dr. Michels had little independent recollection of the subject matter discussed during his medical consultations with Mr. Bunner. While his poor memory is certainly understandable—Dr. Michels testified that he was assigned approximately 1800 to 2000 patients at the CBOC and saw as many as twenty per day—it does not inspire confidence. (Tr. 12.) The Court is particularly reluctant to rely on his testimony that Mr. Bunner did not voice complaints of mouth pain where that testimony was based on Dr. Michels' review of medical records he himself had authored. It seems beyond dispute that Dr. Michels did not keep adequately detailed records. His notes from the medical appointment of May 11, 2011 are as silent as the rest on the topic of mouth sores, though Dr. Michels himself testified that he conducted an oral examination of Mr. Bunner's mouth on that date, observed a lesion, and referred his patient to an otolaryngologist. Dr. Michels also testified that Mr. Bunner was not one to be timid or hesitant to raise his medical concerns, (Tr. 11), yet Dr. Russell, the United States' expert, admitted that he could not locate a single instance in Mr. Bunner's primary care medical records of Mr. Bunner raising a complaint related to his medical issues. (Tr. 114–13.) Dr. Russell had to concede that "it would be a rare patient" to not raise a single complaint over the course of five years of treatment.[15] Because Dr. Michels' progress notes

---

[15] Dr. Russell's review of the primary care records while on the witness stand did not include the records from 2005. (Tr. 113.) However, the Court cannot identify any documented complaints that year either.

provide such little insight into what actually took place during Mr. Bunner's medical appointments, Dr. Michels' reliance on those notes as proof that the complaints were not made is unsustainable.

Because the Court's findings related to breach of the standard of care can be distilled to an issue of credibility, Dr. Russell and Dr. Frierson, the parties' standard of care experts, offer little to assist in this determination.   Dr. Frierson opined that the standard of care had not been met, while Dr. Russell reached the opposite conclusion based on the lack of documentation in the medical records.   The Court finds persuasive Dr. Frierson's testimony regarding the deficiencies in Dr. Michels' notes.   Noting the similarities and lack of differentiation between records, he suggested that Dr. Michels' notes may have been cloned since a physician can duplicate an electronic record with little effort.   (Tr. 64.)   After review of the primary care records, this seems a reasonable explanation for their sparse contents.   In any event, Dr. Russell's contrary conclusion that Dr. Michels satisfied the standard of care, premised solely on the lack of documentation in the medical records, is of little worth.

For these reasons, the Court finds, by a preponderance of the evidence, that Mr. Bunner made complaints of mouth pain throughout the course of his treatment with Dr. Michels.[16]   The Court finds that at least by the time of Mr. Bunner's primary care appointment on February 17, 2010, Mr. Bunner was experiencing a non-healing ulcer on the right side of his mouth and brought

---

[16] The Court similarly is unpersuaded that the absence of documentation of apthous ulcers in Mr. Bunner's dental records is proof that an ulcer was not present.   At the last dental appointment before his cancer diagnosis, held on December 1, 2010, Dr. Mills repaired a chipped tooth on the left side of Mr. Bunner's mouth.   Dr. Mills testified that he would not normally perform a full mouth examination when asked to address an acute dental problem.   Furthermore, there is evidence that the ulcer was hard to see even when it had become malignant.   (Bobbitt Dep. 23.)   It is reasonable to conclude that Dr. Mills may not have seen the ulcer if he was not looking for it.   In the event that Mr. Bunner informed his dentist of the ulcer, as he says he did, it is also reasonable for Dr. Mills, despite his insistence that he would have documented Mr. Bunner's complaints, did not do so.

the ulcer to his physician's attention.   The Court finds that Dr. Michels was negligent in not making a record of Mr. Bunner's complaints of mouth pain, by not recognizing the threat posed by his ulcer that refused to heal, and by not making an earlier referral to a specialist qualified to address the issue.

   B.   *Causation*

   Having determined that Dr. Michels' treatment of Mr. Bunner fell below the standard of care, the Court must next decide if this breach proximately caused Mr. Bunner's injuries under the MPLA.   Because Mr. Bunner proceeds on a "loss of chance" theory, the more particularized question is whether Dr. Michels' failure to follow the accepted standard of care increased the harm to Mr. Bunner and was a substantial factor in bringing about his ultimate injury.   Mr. Bunner bears the burden to prove, to a reasonable degree of medical probability, that he would have had "a greater than twenty-five percent chance" of a better outcome if Dr. Michels had taken his complaints seriously.   W. Va. Code § 55-7B-1(b).

   The Court finds and concludes that the expert testimony received at trial proves to a reasonable degree of medical probability that Dr. Michels' deviations from the standard of care caused Mr. Bunner to undergo more extensive surgery than would have been necessary had the cancer had been detected earlier.   To begin, Mr. Bunner has submitted expert testimony that satisfies the statutory "greater than twenty-five percent chance" requirement.[17]   Dr. Frierson was asked:

---

[17] The United States claims that Dr. Frierson's opinion is unpersuasive because his deposition testimony was far more restrained with regard to causation.   At his deposition, Dr. Frierson offered an opinion that satisfied the "loss of chance" twenty-five percent threshold only when pressed by Mr. Bunner's attorney. The United States focuses on the following dialogue from Dr. Frierson's deposition:

> Q.      Had the standard of care been followed in this case, can you say to a reasonable degree of medical probability that Mr. Bunner would have experienced a greater than 25% chance of improved outcome?
>
> A.      You know, my answer is, absolutely.

(Tr. 71.)   He reasoned that Mr. Bunner's outcome would have improved the earlier the cancer was detected.   Specifically, Dr. Frierson opined that the delay in diagnosis caused exacerbation of the cancer and that Mr. Bunner would have required less extensive surgery with a more prompt diagnosis.   (*Id.*)

---

> Q.      And is it your opinion that had this area in Mr. Bunner's mouth been addressed properly and in the proper fashion and timely fashion, that Mr. Bunner would have had a 25 percent or greater chance of an improved outcome?
>
> A.      Well, you know, it's hard for me to put percentages on things, but I think, you know, the earlier you detect something and if it's a smaller bulk of tumor, the more likely it's going to be managed without as much difficulty and I'm sure the potential for complications would be less with an earlier intervention.

Mr. Bunner's attorney, recognizing the legal inadequacy of this response, asked a follow-up question and received the following answer:

> Q.      [I]n West Virginia, a percentage is required, if you could make that testimony. And I will tell you that 25 percent or greater is the threshold.   Can you say that to a reasonable degree of medical probability?
>
> . . .
>
> A.      You know, if I'm pressed, I am comfortable telling you that I think that's reasonable, that it would be a greater than 25 percent chance.

(Def. Trial Ex. 4 at 22–23, ECF No. 56-14 at 5–6.)   The Court does not find Dr. Frierson's trial testimony unpersuasive in light of the earlier testimony offered at his deposition.   It seems reasonable that a physician would not be accustomed to the somewhat arbitrary "loss of chance" threshold, further, once Dr. Frierson had been familiarized with the applicable legal standard, he testified without equivocation that the delay in Mr. Bunner's diagnosis resulted in a legally cognizable "loss of chance."   (Tr. 71.)   It is also worth noting that alhough Dr. Frierson may have initially been unfamiliar with and thus hesitant to testify concerning the applicable legal standard, the substance of his opinions did not vary between his deposition and trial testimony.   The Court also concludes as a matter of law that permitting Dr. Frierson's to testify at trial regarding the twenty-five percent "loss of chance" standard was appropriate despite his hesitance at his deposition.   *See State ex rel. Krivchenia v. Karl*, 600 S.E.2d 315, 319–20 (W. Va. 2004) (per curiam) (finding that an expert must be permitted to submit opinions so long as he is qualified to do so).

25

The Court finds that Dr. Sperry and Dr. Bobbitt, Mr. Bunner's oral surgeon, were essentially in agreement with Dr. Frierson on this point. Dr. Bobbitt testified at his deposition that oral squamous cell carcinoma normally develops over a very long period of time, but added that Mr. Bunner's cancer was somewhat atypical because it was "growing quickly." (Bobbitt Dep. 23.) He speculated that the surgery required to remove Mr. Bunner's cancer was necessitated in part because of its uncharacteristic growth pattern: it was "deep-growing" rather than superficial. (*Id.* at 24.) The location of the cancer also posed a challenge from a surgical perspective. Dr. Bobbitt testified that a similar malignant growth in a different location, such as the tongue, would likely not have required a skin graft due to the thickness of the tissue in comparison to the cheek. (*Id.* at 28.) However, when asked if the cancer would have been easier to treat if surgery had been performed six months earlier, Dr. Bobbitt testified: "It's easier to treat the smaller it is, but my problem on that is, I don't know what it looked like before he came in. . . . Probably, you know, smaller is better. If you don't have to take as big of a piece, it's a lot easier to put back together." (*Id.* at 27.) He testified to a reasonable degree of medical probability that "[i]t would have been a smaller piece six months ago" and repeated that "smaller is probably easier to – easier to treat, or at least it's a smaller hole to close." (Bobbitt Dep. 29.)

Dr. Sperry similarly described Mr. Bunner's surgery as "relatively extensive." (Tr. 173.) Though he testified as a witness for the United States, the Court finds that Dr. Sperry's testimony bolsters Mr. Bunner's causation theory. Dr. Sperry estimated, based on his examination of the pathology slides, that Mr. Bunner's cancer had been present for approximately six to eight months prior to the July 2011 surgery, or since approximately late 2010.[18] Mr. Bunner attended primary

---

[18] It is not entirely clear from the trial testimony whether Dr. Sperry based his estimation on his examination of the tissue biopsied on June 22, 2011, or on the tissue excised by Dr. Bobbitt on July 13, 2011. Given

care appointments with Dr. Michels in September 2010, November 2010, and February 2011. The Court finds as a matter of fact that Mr. Bunner complained of a non-healing, painful mouth sore during these appointments, and that the malignancy could likely have been detected at least by the time of the November 2010 appointment.   However, Mr. Bunner told the VAMC nurse during his phone call of April 21, 2011 that his ulcer had been present for about a year.   His report does not conflict with Dr. Sperry's testimony because Dr. Sperry testified that squamous cell cancers are preceded by abnormal changes in the epithelium which could also have been detected by pathology.   (Tr. 166—67.)   Dr. Sperry's admission that it was "more likely than not" that Mr. Bunner developed a precancerous lesion in his mouth struck a death knell to the Government's defense.   (*Id.*)   In other words, the Government's own witness confessed that even if the cancer *itself* had only been present since the end of 2010, this cancer most likely developed from an abnormal mouth sore which could have been identified as precancerous and monitored by conscientious medical treatment.

The Court finds as a matter of fact that at some point between 2006 and 2010, Mr. Bunner developed an aphthous ulcer in his mouth that, over time, took on pre-cancerous characteristics and turned malignant.[19]   This conclusion is supported by Mr. Bunner's testimony that the ulcer on the right "never went away," (Tr. 32), medical records showing that an oral rinse designed to numb

---

the short elapse of time between the two appointments, it does not make much difference.   Still, Dr. Sperry had been discussing Dr. Bobbitt's pathology slides just before opining on the cancer's trajectory (Tr. 151–53); thus, the Court will find that his estimated onset date of Mr. Bunner's cancer should be calculated from the July 2011 date.

[19]   The Court finds it unnecessary to determine whether the ulcer that eventually turned cancerous was the same ulcer that Dr. Armeni observed on the right-hand side of his mouth by the otolaryngologist in 2006. This lesion was not biopsied in 2006, and it is certainly possible that, while it may have waxed and waned over the years in intensity, it later became malignant.   It is sufficient for purposes of Mr. Bunner's malpractice claim for the Court to find that the ulcer was present, painful, and persistent at least by the spring of 2010.

mouth pain was prescribed to Mr. Bunner on three occasions without explanation, and various supportive statements made by Mr. Bunner and recorded in the VAMC records indicating that the sore had been present by the spring of 2011 for "over one year."   (ECF 56-1 at 18, 29.)   By the time Mr. Bunner's cancer was diagnosed, the ulcer was over two centimeters in diameter and had extended deep into the buccal mucosa.   (*See* ECF No. 56-1 at 18.)   Mr. Bunner required two surgeries and skin grafts before he was finally rid of the cancer; the Court finds persuasive and adopts Dr. Frierson's testimony that these interventions would have been less intensive if Dr. Michels had taken Mr. Bunner's complaints seriously.   Based on the foregoing, Mr. Bunner has proven by a preponderance of the evidence that but for Dr. Michels' conduct, he would have had an appreciably better outcome.   Mr. Bunner has also proven that Dr. Michels' negligence deprived him of a twenty-five percent or greater chance of an improved outcome, namely, less extensive surgery.

C. *Damages*

In an FTCA action, a plaintiff is eligible to recover against the United States any damages that would be available against a private actor under applicable state law.   The MPLA allows for the recovery of special damages, *see Osborne v. United States*, 166 F. Supp. 2d 479, 493–94 (S.D. W. Va. 2001), and establishes a statutory cap of $250,000 on a plaintiff's recovery of damages for pain, suffering, mental anguish, and other non-economic losses.[20] W. Va. Code § 55-7B-8(a); *Wilson v. United States*, 375 F. Supp.2d 467, 470-71 (E.D. Va. 2005) (applying the MPLA's non-

---

[20] This statutory cap is raised to $500,000 where the plaintiff proves that the medical negligence resulted in death or disabling injury.   W. Va. Code § 55-7B-8(b).   Mr. Bunner's injuries are not sufficiently serious to trigger this exception, and the $250,000 cap thus applies.

economic damages cap in an FTCA action).   Additionally, the FTCA does not permit recovery of punitive damages or pre-judgment interest.   28 U.S.C. § 2674.

An injured party must generally prove resulting damages with reasonable certainty.   *See Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West Virginia, Inc.*, 413 S.E.2d 670, 676 (W. Va. 1991).   Mathematical certainty is not required.   *Mollohan v. Black Rock Contracting, Inc.*, 235 S.E.2d 813, 816 (W. Va. 1977) (citing *Belcher v. King*, 123 S.E. 398, 402 (W. Va. 1924)).   "The party seeking to reduce the amount of damages shown to a reasonable certainty has the burden of 'producing evidence to show the proper reduction.'"   *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir. 1982) (quoting *Funston v. United States*, 513 F. Supp. 1000, 1010 (M.D. Pa. 1981)).

The parties previously stipulated that Mr. Bunner incurred $249,456.48 in medical expenses in the treatment of his cancer and subsequent rehabilitation.[21]   (Joint Trial Ex. 3, ECF No. 56-7.)   The Court **FINDS** that these medical expenses are attributable to the United States as a result of its negligence.   Mr. Bunner also seeks to recover non-economic losses for pain and suffering.   W. Va. Code § 55-7B-8(a).   By the time Mr. Bunner's cancer was removed at the CAMC, it had grown to such a depth that a skin graft was necessary to close the wound.   Post-surgery and while still at the CAMC, Mr. Bunner testified that he developed a blood clot in his arm.   His physicians opened his arm from elbow to wrist to remove the blood clot.   Mr. Bunner now suffers from extensive nerve damage in his left arm.   He has undergone seven surgeries in the last five years to repair the damage, but his left arm's sensation and mobility have not been

---

[21] The stipulation does not include the cost of the excisional surgery performed by Dr. Bobbitt.

restored.   Some of these procedures, Mr. Bunner testified, have been extremely painful.   (Tr. 40–41.)

Mr. Bunner testified that his way of life has been irreparably altered as a result of Dr. Michels' negligence.   He testified that he and his wife purchased a motor home and traveled extensively prior to his surgery.   (Tr. 34.)   He was an avid bass fisherman, and led active bass fishing clubs at local public schools.   Due to the nerve damage in his left hand, Mr. Bunner has been rendered incapable of operating either his motorhome or his bass fishing boat.   (Tr. 42–43.) Mr. Bunner played the guitar since his teenage years, and for years traveled under contract as a paid country musician.   (Tr. 35.)   After his marriage to Charlotte Bunner, he and his wife traveled throughout the region singing gospel music.   (Tr. 36.)   He no longer has the strength in his left hand needed to create chords on his guitar.   (Tr. 43.)   The Court finds that $150,000 is justified to compensate for the pain, suffering, and loss of life enjoyment he has endured.   In total, to fully compensate Mr. Bunner for his economic and non-economic damages proximately resulting from Dr. Michels' negligence, the Court awards him $399,456.48.

### V.   Motion to Dismiss Charlotte Bunner's Loss of Consortium Claim

As a prerequisite for filing a civil action against the United States under the FTCA, a plaintiff must first present an administrative claim.   28 U.S.C. § 2675(a).   This requirement is jurisdictional and cannot be waived.   *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986) (citing *Kielwien v. United States*, 540 F.2d 676, 679 (4th Cir. 1976)).   If there are multiple claimants, "each claimant must individually satisfy the jurisdictional prerequisite of filing a proper claim, unless another is legally entitled to assert such a claim on their behalf."   *Muth v. United States*, 1 F.3d 246, 249 (4th Cir. 1993) (citing *Frantz v. United States*, 791 F. Supp. 445, 447 (D. Del. 1992) (internal quotation marks omitted)).

Under West Virginia law, loss of spousal consortium is a cause of action separate and distinct from the underlying claims of the injured spouse. *DuPont v. United States*, 980 F. Supp. 192 (S.D. W. Va. 1997) (citing *Shreve v. Faris*, 111 S.E.2d 169, 173 (W. Va. 1959) (right to consortium is "peculiar and exclusive" to each spouse)). In *DuPont*, this Court held that the FTCA thus requires a spouse to submit his or her loss of consortium claim to the appropriate administrative agency before bringing it in federal court. *Id.*; *see also Goforth v. United States*, No. 1:09-0003, 2015 WL 4878369, at *12 (S.D. W. Va. June 1, 2015) (dismissing a spouse's loss of consortium claim for failure to exhaust). Mrs. Bunner did not join her husband's administrative claim, (*see* Compl. Ex. A, ECF No. 1-1), nor did she submit her own. (*See* Tr. 91–92.) The Court is thus without jurisdiction to hear Mrs. Bunner's claim. The Court therefore **GRANTS** the United States' motion to dismiss Mrs. Bunner's claim for lack of subject matter jurisdiction and **ORDERS** her loss of consortium claim dismissed.

## VI.    FINAL CONCLUSIONS OF LAW

The Court concludes that Mr. Bunner established by expert testimony the requisite elements of his medical professional negligence claim: the standard of care for a medical professional under similar circumstances, a breach of that standard of care, and that the omissions on the part of Dr. Michels proximately caused the injury sustained by Mr. Bunner. Mr. Bunner has also proven by a preponderance of the evidence that Dr. Michels' negligence deprived him of a greater than twenty-five percent chance of a better outcome. Accordingly, the Court enters judgment against the United States in the amount of $399,456.48.

The Court further finds that it lacks subject matter jurisdiction over Charlotte Bunner's loss of consortium claim, and the same is hereby **DISMISSED**.

31

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 30, 2016

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

32